UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARGARET A. KINLEY,

          Plaintiff,

vs.                              CIVIL NO.:  05-CV-71758-DT

COMMISSIONER OF              HON. BERNARD A. FRIEDMAN
SOCIAL SECURITY,           MAG. JUDGE WALLACE CAPEL, JR.

          Defendant.
_____/

**REPORT AND RECOMMENDATION**

## I.  RECOMMENDATION

It is recommended that the Court grant Plaintiff's Motion for Summary Judgment in part, deny Defendant's Motion for Summary Judgment, and remand this case for proceedings consistent with this Report.

## II.  REPORT

This is an action for judicial review of the Defendant Commissioner's final decision denying Plaintiff's application for disability insurance benefits [DIB].  Plaintiff signed her application for benefits on September 26, 2000, alleging that she has been disabled and unable to work since July 27, 1998, due to "major depression as a result of chronic pain [and] sleep disorders due to fibromyalgia and chronic fatigue immune dysfunction."  (TR 74-77).  The Social Security Administration [SSA] denied benefits initially on June 12, 2001.  (TR 34-37).  A de novo hearing was held on September 16, 2002, before Administrative Law Judge [ALJ] Regina Sobrino.  (TR 259-98).  In a decision dated November 20, 2002, the ALJ found that Plaintiff was not disabled.  (TR 45-54).

On May 17, 2003, the Appeals Council remanded the case with instructions to the ALJ at the request of Plaintiff.  (TR 60-63).  A second hearing was held on April 13, 2004. (TR 299-366).  In a decision dated August 23, 2004, the ALJ again found that Plaintiff was not disabled.  (TR 16-28). The Appeals Council denied a request to review the decision on March 3, 2005.  (TR 6-8).  The Plaintiff has commenced this action for judicial review.

A.   **TESTIMONY**

1.   **September 16, 2002, Hearing**

Plaintiff testified that she was born on February 28, 1956, and was forty-six years old at the time of the hearing.  (TR 264).  She stated that she lives in Bay City, Michigan, in a house with her eighteen year old son and husband. (TR 263-64).  She testified that she graduated from Michigan State University in 1978 with a Bachelor of Arts degree in Business Administration.  (TR 291).

She reported that she last worked on July 23, 1998, and that July 24 was a vacation day.  (TR 264).  She explained that she reported July 27, 1998, as her onset date because she thought "that was the first reported day of illness," and that was also the day she became unable to work as a result of same.  (TR 264-65).

She indicated that she currently suffers from chronic pain, fibromyalgia, and depression, which is a result of the chronic pain.  (TR 265).  She stated that the chronic fatigue started in 1987.  (TR 285). Dr. Rao, her psychiatrist, is looking at a new medication that is not yet on the market to treat her because she is not getting much relief on her current medications.  (TR 265-66).  Further, she stated that she currently takes the medications with "the least amount of side effects."   (TR 265).

She stated that she currently takes Wellbutrin, Neurontin and Ambien.  (TR 266).  She stated that she does not have any noticeable side effects from them.  She explained that "[t]hey're supposed to make me tired but they don't.  If anything most medications affect me the opposite way.  I don't

2

sleep very much." Id.  She stated that she takes the Ambien to help her sleep, maybe twice a month, but only when she has not slept for a couple of days because it is addictive.  (TR 266, 283-84).

Plaintiff stated that she worked through her illnesses from 1991 to 1998, but she had a lot of painful days.  (TR 285).  She explained that she stopped working in 1998 because her pain had reached a level that she could no longer control and that nothing was helping her.  (TR 286).  She stated that she could not take the muscle relaxer, Elavil, and work.  Id.  She stated that she would take it at night and wake up the next day and be unable to drive as if she had a hangover.  Id.

She further explained that she was pushing herself too hard at work and being on the phone and computer for ten hours a day in addition to driving home was too much.  (TR 287).  She stated that the constant pain and inability to concentrate keep her from working.  (TR 288).

She stated that she also has been prescribed Synthroid for her thyroid.  (TR 271).  She stated that she was started on fifty micrograms, but she has not seen any results.  Id.  She stated that she had her blood work retested and it was normal.  (TR 272).  Her dosage was then increased to one hundred micrograms, but she is not seeing substantial improvement.  Id.

Plaintiff stated that her regular physician has been Dr. Jorge Plasencia since she switched insurance companies to Health Plus.  (TR 266).  She stated that she originally treated with Dr. Rivette and then with Dr. Gollapudi.  (TR 269).  She stated that she only saw Dr. Gollapudi once because she was not knowledgeable about fibromyalgia.  Id.  She stated that she has not been hospitalized since July 1998, but she almost went in the night before the hearing because she was in a lot of pain.  (TR 266-67).  She indicated that she was still in a lot of pain at the hearing.  (TR 267).

She explained that she took Darvocet, which was two years old, and called her doctor.  Id.  She stated that the doctor on call told her that it might be her gallbladder and that she needs to have some testing done.  Id.  She stated that the doctor offered to call in a prescription for Vicodin, but she did

not have access to a twenty-four hour pharmacy.  Id.  She stated that she also took some Tagamet with the Darvocet.  Id.  She reported that the medication helped for a little while, but the pain is returning. Id.

She stated that the pain she was in differed from her prior muscular pain.  Id.  She explained that it was more intense and in her stomach and upper abdomen.  Id.  She indicated that her typical pain is in her back or elbows, knees, feet, and hips.  (TR 268).  She stated that it feels like it is in her joints, but it is actually in her muscles surrounding her joints.  Id.

Plaintiff testified that she was treated by Dr. Manlapit, a rheumatologist, who diagnosed fibromyalgia and chronic fatigue immune dysfunction.  Id.  She stated that he treated her with Elavil, which sedated her, and then Davocet.  (TR 268-69).  She reported that she had a tolerance for the narcotic and Dr. Manlapit did not want to try anything stronger.  (TR 269).  He then referred her to Dr. Rao for antidepressants to help with her pain.  Id.

Plaintiff testified that she sometimes has trouble standing or walking.  Id.  She reported that some days are better than others and there is no way to predict what she will feel day to day.  Id.  She stated that sometimes it changes with the weather.  Id.  She stated that she can usually stand for ten or fifteen minutes before she needs to sit.  (TR 270).  However, she stated that she cannot sit too long before she gets stiff and sore, maybe for an hour.  Id.  She stated that she may sit while she watches television, but she does not pay attention to how long she is sitting.  (TR 280).  She stated after sitting she gets up to move and "walk the soreness out."  (TR 281).

She stated that when her spine hurts, she needs to lie down to relieve the pain.  Id.  She stated on good days she might lie down once and on a bad day she will lie down until her husband comes home.  Id.  She stated that she then forces herself to get up to shower and dress.  Id.  She reported that sometimes she does not go to bed until her son and husband leave the house in the morning.  (TR 287).

4

Thus, she stated that she stays in bed for about eight hours until they come home. Id. She indicated that she also has pain lying in her bed if she "roll[s] from side to side." (TR 270).

She stated that walking feels good, but she still has some pain doing same. Id. Nevertheless, she indicated that walking sometimes helps with her hips after sitting too long. Id. She stated that she can probably walk for an hour. Id. She reported that sometimes she will go to the grocery store just to walk around. Id. She explained that she walks behind a cart. (TR 280). She stated that she does not think about whether it is an improvement or not; she does it because she knows she needs to move. And some days she feels like she could keep going. Id. She stated that lifting and carrying things is painful. (TR 270). She stated that she could not lift or carry anything heavier than ten pounds. (TR 271).

She stated that she sometimes has trouble using her hands and fingers. Id. She stated she has tremors and her dexterity is sometimes off. Id. She reported "a difficult time writing." Id. She stated that her shoulders and elbows sometimes ache when she reaches, and her muscles in her shoulder are so tight that it is difficult to turn her head. (TR 272). She stated that bending at the waist is also difficult. Id. If she drops something, she stated that she goes down to her knees or squats, but she cannot stay in that position too long because she will have trouble standing back up. Id. Plaintiff reported that she does have problems with grip strength on some days. (TR 279). She stated that she has dropped things; and, although she hasn't dropped a cup of coffee lately she does spill things often. Id.

She stated that she does not have any trouble climbing up or down stairs unless she is having a bad day in general. (TR 272-73). She indicated that she has a two story house and uses the stairs when she has to regardless of pain. (TR 273). She stated that her bedroom is on the second floor. Id. She stated that she does not use a cane for walking. Id.

5

Plaintiff testified that she does most of the cleaning, cooking, and laundry.  Id.  She stated that she paces herself and she works in fifteen to thirty minute increments on a good day, but if she is not feeling well chores go unfinished.  Id.  She stated that she does not do yard work.  Id.  She stated that her husband takes out the garbage, but on occasion she takes a bag out to the trash can.  Id.  She stated that she shops for groceries and other things and she puts them into the cart and then into her car.  (TR 273-74).  She stated that she carries things in the house herself or gets help doing same.  (TR 274).

Plaintiff stated that she does "laundry almost everyday or every other day."  (TR 277).  She stated that she loads the clothes, unloads them and hangs them up or puts them away.  Id.  She stated that even on bad days she will do laundry if it needs to be done.  (TR 277-78).  She stated that a bad day is not wanting to get out of bed.  (TR 278).  She stated that she has about three to four bad days a week where she does not get out of bed.  (TR 278, 286).  She stated that her condition has been at that severity for the past six months to a year.  (TR 281, 286).  She indicated that her condition has worsened since 1998 when she stopped working.  (TR 278, 288).

Plaintiff described a typical day.  (TR 282-84).  She reported that she gets up and makes her bed, makes her son's bed, and then goes downstairs sometimes to fix herself something simple to eat and sits and watches television.  (TR 282, 284).  She stated that she also might read.  (TR 282).  However, she stated that when she is having a bad day, she has problems watching television, and concentrating on it as well as reading newspapers and magazines.  (TR 282-83).  She testified that she subscribes to a chronic fatigue magazine.  (TR 283).  She explained that she has to reread things.  Id.  She also reported trouble remembering what she's doing on the computer.  Id.

She stated that she is having a difficult time organizing things and forgetting things.  (TR 284).  For example, she stated that she made brownies recently, and when the timer went off she opened the

oven door, but left the brownies in there.  Id.  She stated that her son had to tell her that the brownies were burning.  Id.

She stated that Dr. Plasencia prescribed Midrin for migraine headaches.  (TR 278-79).  She reported that the headaches were painful and one side of her head.  (TR 278-79, 288).  At first, she thought they were sinus related because she had pain when she touched around her eye.  (TR 288).  She reported that she felt nauseated and did not want to get out of bed with the headaches, which last three to four days at times.  (TR 279).  She stated that the medication did help, but made her tired and sleepy.  (TR 279, 288).  She stated that she takes the Midrin when she has the onset of a headache.  (TR 289).  She stated that she took sixty pills last month, on average three to four days a week, and had to get a refill.  Id.

She stated that she still drives, but feels anxious doing same.  (TR 274).  She testified that her husband drove her to the hearing.  Id.  She stated that she does not generally drive, but she has driven from her home to Flint to see some independent medical examiners.  Id.  She testified that if she goes on a trip she may share the driving, but she cannot drive too long because she gets agitated and she experiences pain from holding onto the wheel or has trouble gripping it.  Id.

She stated that she can bathe and dress herself.  (TR 275).  Additionally she reported that she takes care of her dog, which is half Chihuahua and half Fox Terrier.  Id.  She stated that she does not take her on walks.  Id.  She stated that she does not belong to any group or organizations where she sees other people regularly.  Id.  She stated that she would go to her son's game when he was in high school and "that group of friends were the only people [she] really would see on occasion."  (TR 275, 279).  She stated that there were a couple of times where she was unable to go to a game.  (TR 276).

She stated that she does not have any hobbies, nor did she have any when she was working.  (TR 276, 279).  She reported that she tries to research her illnesses as much as possible.  (TR 276).

7

She indicated that she has a computer and knows how to use it, but sometimes using it is painful.  Id.
She explained that she cannot stay on the computer very long and although she has an ergonomic pad,
reaching the mouse is difficult.  (TR 276, 283).  She stated that she is going to attend a newly formed
fibromyalgia support group that meets locally at the rehabilitation center in Bay City.  (TR 276).

She stated that relations with her husband are good and that she does not visit often with
friends, relatives or coworkers.  (TR 281-82).  She stated that on occasion, she may visit with her
husband's acquaintances or their wives.  (TR 282).

### 2. April 13, 2004, Hearing

#### a. Plaintiff's Testimony[1]

Plaintiff stated that she had the same living arrangement as during the prior hearing.  (TR 303).
She reported that her bedroom is still on the second floor of her home.  (TR 311).  She stated that she
was first diagnosed with fibromyalgia in 1989, was off of work for a year and nine months, then
returned and worked through her pain for about seven years.  (TR 337).

She reported that she saw rheumatologist Dr. Manlapit, and he tried to treat her with Elavil and
Darvocet.  Id.  She explained that the Darvocet did not help her pain at all.  (TR 338).  She stated that
was when she was referred back to Dr. Rao.  Id.  She stated that Dr. Rao has tried every new drug on
the market to treat her, but with no good results.  Id.  She stated that she has tried everything and
testified that "I want to get healthy and I want to enjoy my life and go back to work and I can't."  (TR
339).  She stated that she has tried physical therapy, and it seemed to help her while she was there, but
then when she left the pain came back.  Id.  She stated that she has tried every pain medication, been
to a pain clinic, and tried sleep studies as well.  (TR 350-51).

---

[1]Plaintiff confirmed portions of her prior testimony from the September 16, 2002, hearing.
Some portions of her testimony are omitted here to prevent redundancy.

8

She stated that she no longer used Midrin for migraine headaches. (TR 303). She stated that she was recently prescribed Theorocet because the Midrin was no longer working. Id. She stated that she also takes Neurontin, Wellbutrin, Ortho Tri-Cyclen for endometriosis, Intex PFE, Ambien, Armour Thyroid, Viorocet, Valium for back pain, and Nasacort AQ for allergies. (TR 303-04, 325-26). She also reported taking the following nonprescription drugs in February 2004:[2] 1,000 micrograms of B12, 25 milligrams of DHEA, Thymax II, Disodium Phosphate, Magnesium Latate, Spanish Black Radish, Uthrophin, Mentran, Petatrophin PMG, Super EFF, and Antronix. (TR 304, 327). She stated that she does not suffer from any side effects currently. (TR 304). She stated that she takes the Wellbutrin and Neurontin because they cause the fewest side effects. Id. However, she stated that she still does not sleep well. (TR 305). Later she stated that she does sometimes experience nausea when questioned about side effects from the nonprescription drugs specifically. (TR 328).

She testified that last week she took the Viorocet two or three times for her headaches. (TR 326). She explained that last week was not necessarily a typical week because she sometimes goes two or three weeks without a headache at all. Id. Then, she may have a headache "that lasts for days and days." Id.

Plaintiff reported that she no longer takes the Valium at all. (TR 327). She stated that she was taking it for muscle pain. (TR 326). She explained that she had injured her back and in January it was still sore. Id. She reported that she was still taking muscle relaxers, Valium and Flexeril at that time, but it still did not relieve her pain. Id.

She stated that she was still treating with Dr. Rao, and that Dr. Plasencia was still her primary care physician. (TR 305). She stated that she did attend a fibromyalgia support group a few times. (TR

---

[2]Plaintiff stated that these drugs were all whole food supplements. (TR 327). She stated that they are from "a chiropractor who does clinical nutrition." Id.

305-06).  She stated that she was unable to go to many of the meetings, because she was not feeling

well and the times are inconvenient.  (TR 306, 328-29).  Plaintiff stated that she drove herself to the

hearing.  (TR 307, 310).

In the past two years, she stated that she had visited family in Pittsburgh, Pennsylvania, but she

did not do any of the driving.  (TR 307, 329).  She stated that the last time they went was in October

2003.  (TR 307).  She testified that she went to Mexico in 2003 with her husband, son, and his

girlfriend.  (TR 329-30).  She stated that she did not do any sightseeing in Mexico; rather, she just sat

in the sun and tried to "feel better."  (TR 330).  She reported having diarrhea associated with the trip.

(TR 329).

She reported that she does not shop for clothes or anything other than groceries anymore.  (TR

310-11).  She reported that she lives about a half mile from the grocery store.  (TR 311).  She reported

that she takes herself to doctors appointments, but schedules them in the afternoon because she sleeps

during the day because she is unable to sleep at night.  Id.  She stated that she has not stayed overnight

at the hospital since the last hearing, nor has she been to the emergency room.  Id.

Plaintiff stated that she still has three to four bad days a week, primarily due to pain.  (TR 308,

313).  She reported that on a bad day, she stays in bed.  (TR 308).  She stated that she does not usually

get dressed, but may get up for a little while, might use the bathroom, then she will come back and lay

down.  Id.  She stated that if she does go downstairs, she sits in her recliner.  Id.  She stated that she still

does not like to take her sleep medication because it is addictive.  (TR 308-09).  She explained that she

only takes it if she has not slept in more than two days and that it does help her sleep.  (TR 309).

She stated that nothing has really changed since the past hearing.  Id.  She indicated that she is

"still just trying to find any method that [she] can to find relief from pain and it hasn't worked so far."

Id.  Plaintiff stated that although she was well dressed for the hearing, wearing makeup and had her hair

10

done, this is not something that she did on a normal basis.  (TR 310).  She explained that it took her over two hours to get dressed for the hearing.  Id.  She indicated that normally would only take her forty-five minutes to get ready.  Id.  She stated that she does try to take a shower everyday.  (TR 313).

Plaintiff reported that she started seeing a chiropractor, Dr. Markel, a couple of weeks ago and was told that she may have damaged vertebra in her neck and lower back previously.  (TR 330-31, 332).  She stated that she has "limited turning ability."  (TR 331).  She stated that she has been to see the chiropractor twice and authorized for a total of six visits.  Id.  She stated that Dr. Markel and her primary care physician, Dr. Plasencia, are communicating regarding her condition.  (TR 332-33).  She explained that her insurance allowed Dr. Plasencia to refer her to Dr Markel.  (TR 332).  She reported that she can only concentrate for five to ten minutes at a time and stated that her husband criticized her for not being able to finish anything.  (TR 313).

She stated that Dr. Markel suspected a possible plaque buildup due to her memory loss and problems with dexterity.  (TR 333).  She stated that MS could cause a plaque buildup and he wants her to have an MRI, but she will have to go through her insurance first.  Id.  She stated that over the years she has always followed her doctor's recommendations.  (TR 334).  She also reported that she was recommended to a pain clinic where she saw Dr. Grover.  (TR 331).  Dr. Grover told her that there wasn't a whole lot he could do for her and thought that the injection might be more painful than the pain itself and is only a temporary fix.  Id.

Plaintiff indicated that her condition has changed the nature of some of her relationships with people.  (TR 334).  She testified that it has been difficult for her husband.  (TR 334-35).  She reported that since her son graduated from high school, she is less social.  (TR 335).  She stated that her neighbor tries to socialize with her, but she often has to back out of their plans because she does not

11

feel well.  Id.  She told Dr. Fritzen she tries to go out on Friday nights to dinner, and they may invite

other couples to go with them, but after dinner she just goes home.  (TR 314).

### b.    Robert D. Fritzen's Testimony

Dr. Robert D. Fritzen testified at the hearing.  (TR 312-23).  Dr. Fritzen testified that plaintiff

> had documentation of a major depressive disorder, dysthymia, adjustment disorder
> with anxiety.  Pain disorder associated with both psychological factors and general
> medical condition.  There are also was [sic] some hint of a[n] obsessive-compulsive
> personality trait, but I do not believe that, that was particularly made into a diagnostic
> process.  There also was a depressive disorder not otherwise specified although that
> would be covered under the two affective disorders that generally have been
> diagnosed.

(TR 314).  However, Dr. Fritzen found that although she met the A criteria associated with an

affective disorder listing of impairments she did not meet either the B or C criteria level.  (TR 315).

He stated that her activities of daily living were only moderately limited.  Id.  He also found that her

difficulty in maintaining social functioning and maintaining concentration, persistence or pace was

moderate.  Id. Further, she had no episodes of decompensation of an extended duration.  Id.

According to Dr. Fritzen, there's been little change in regard to the records regarding Plaintiff's

degree of limitation from her onset date to present.  Id.  He reiterated that her limitations were

moderate, and that her functional limitations did not reach a marked level.  (TR 316).  He stated that

it was the cumulative affect of her limitations that brought them to a moderate level.  Id.  Upon

questioning by Plaintiff's counsel, Dr. Fritzen stated that her "psychological factors would be at a

level at which maintenance of work could be maintained if the physical functioning were not as

dramatic as it is spoke[n] to in regard to the evidence."  (TR 317).  Dr. Fritzen clarified that

> [t]here is an anticipation that she may do poorly if she were to return to her work in
> regard to the psychological issues.  But that is in combination with the pain and
> fatigue areas.  Taken by themselves the psychological dynamics do not appear to be
> at a severe level at this particular point.  One of the physicians, I believe, stated that

12

> she does not appear to be chronically disabled.  And we have GAF ratings as high as
> 65 which are very mild symptoms relative to the psychological conditions. . . . so it
> appears that it is at a level which certainly is difficult for her and influences her, not
> that it would preclude work or certain types of work at this time.

Id.  When questioned about a prior GAF of 49, Dr. Fritzen indicated that he regards such findings as

subjective.  (TR 318).  He indicated that it would be "possible" that such fluctuations could show that

plaintiff had been having a good day, one day and about it another, but stated that he did know.  Id.

Dr. Fritzen further testified that an additional exhibit added at the hearing that indicated that an

independent medical examination by Dr. Talasela found that plaintiff would be unable to work, would

not change his testimony.  (TR 319-22).[3]

### c.     Mary Jo Kosentona Voelpel's Testimony

Dr. Mary Jo Kosentona Voelpel also testified at the ehearing.  (TR 323, 335-60).  Dr. Voelpel

testified that the record documents Plaintiff's fibromyalgia, but the medical evidence is not clear

regarding her physical limitations.  (TR 340).  She stated that "[t]here maybe enough evidence to

indicate that there is a degree of disability.  But the severity of the disability is very difficult to clearly

establish because by our established criteria, it falls kind of in between the guidelines rather than right

on them."  Id.  Dr. Voelpel indicated that there is not "any medical evidence of any structural

limitations."  (TR 341).  She explained that

> it would just be conjecture if we thought there would be the ability to function.  In
> terms of actual documentation of limitation there isn't any.  But the practical part of
> it is that there would be most likely significant functional limitations because of the
> loss of endurance in muscle strength and tone that occurs because of the chronic
> illness.  On the average, if you take a healthy individual from the age of 35 to 40 on
> they lose approximately a pound of muscle mass a year.  Now if you add an additional
> limitation of function to that than there is significant muscle loss on a year to year
> basis and then it limits your activities even further.  If there would be a way to

---

[3]The actual examination was not attached to the report, but a block was checked off that said,
plaintiff was "found to be unable to work at the time of the above examination."  (TR 319).

> quantify that limitation it may be easier to make a decision in terms of whether or not the individual could engage in light activities. And it appears as though it is possible with just mild restrictions the claimant could do that. Whether or not that's practical based on functional abilities that she's lost is difficult to say.

(TR 341-42). She testified that the problem with fibromyalgia is that "[t]here isn't a specific laboratory test that we can rely on that helps us consistently determine the activity of the disease." (TR 342). She explained that muscle strength testing and extensive physical exams would be helpful in terms of predicting the claimant's endurance capabilities. (TR 343-44). However, based on the activities discussed and evidence regarding those activities, Dr. Voelpel stated that Plaintiff would likely be able to do light activities. (TR 344-45).

The ALJ and Dr. Voelpel discussed loss of muscle tone. (TR 345-47). Dr. Voelpel stated that "[T]he initial records when they indicated that there could be light activity with just restriction of heavy lifting and frequent periods of rest certainly appears as though that's capable and from the records it's very possible in terms capabilities." (TR 347). She stated that Plaintiff could do light activity involving lifting and carrying as well as pushing and pulling no more than 20 pounds occasionally or 10 pounds frequently. Id. Further, Dr. Voelpel stated that the record indicated that it was possible that she could be on her feet as many as six hours in the hour workday. Id.

Plaintiff's counsel questioned Dr. Voelpel. (TR 348-56). Dr. Voelpel stated that the frequent periods of rest would be individualized. (TR 348). She explained that it

> depend[s] upon what repetitive activity is being done. If we are exercising a muscle group to minimize the fatigue if you take it to a certain level and then you feel the sensation that I can't function anymore and rest for a minute and then you can go on and repeat that function again so that's very individualized. So could I state specifically that someone could lift 10 pounds 10 times, not necessarily, there maybe a level of fatigue one day that would be present that wouldn't be present another day.

Id. She later stated that

14

[i]n other words, let's say you're writing a document and there's a certain amount of muscle tone that you require, you know, in your hand and your arm.  So you're writing and you may fatigue.  So it may not even be someone that a co-worker would notice but then you would just rest until you felt as though that you had enough tone to continue the sentence - - So it's not anything necessarily where you would leave your desk but it would certainly impact what you were doing on a functional basis.

(TR 359-60).

Dr. Voelpel stated that her therapy was predominantly for depression and that there was not adequate documentation regarding her anti-inflammatory or pain management.  (TR 349).  She stated that it was not uncommon for a fibromyalgia patient to be intolerable to standard drug treatment or to fail to respond to same.  (TR 349-50).  Dr. Voelpel pointed out that the only consistent treatment that Plaintiff received was for depression.  (TR 349-51).

Dr. Voelpel testified that she was not a rhuematologist.  (TR 352, 358).  However, Dr. Voelpel did state that she sees some patients suffering from same.  (TR 359).  Further, she stated that Dr. Manlapit, a rheumatologist, did document trigger points relating to her fibromyalgia.  (TR 353).  Nonetheless, Dr. Voelpel reiterated that a diagnosis of trigger points and fibromyalgia do not document functional restrictions alone.  (TR 355).  The doctor explained that evaluation of someone with headaches and trigger points is different than evaluating trigger points relating to fibromyalgia.  (TR 354).

Dr. Voelpel stated that there was not "documented evidence of the trigger points or the deepex that they feel maybe contributing to the headaches."  (TR 352).  Further, she stated that if Plaintiff had cervical vertebra malalignment that can contribute to the headaches being structural.  Id.  Dr. Voelpel further stated that the MRI that was recommended may be to determine whether "there were any underlying vascular defects."  (TR 353).

15

Dr. Voelpel stated that in relation to the lack of structural limitations, this does not mean that a person could do light work without pain or fatigue.  (TR 355).  She stated that a person with the documented fibromyalgia, such as Plaintiff's, would have pain consistent with what is reported.  (TR 357).  Further, she testified that "[b]ecause of the medication that's required there would be restrictions in terms of the ability to focus, to think, to do things repetitively.  There would be issues of stamina and of endurance."  (TR 356).  If someone was experiencing pain and fatigue to the level documented by Plaintiff's testimony and medical evidence, Dr. Voelpel testified that such a person would "[m]ost likely not" be able to engage in full-time work activities.  Id.

**B.    MEDICAL EVIDENCE**

Examination of the parties' cross-motions for summary judgment reveals that an additional recitation of the Plaintiff's medical evidence would be repetitive.  The pertinent record medical evidence relied upon by this Court is fully articulated in the Analysis.[4]

**C.    VOCATIONAL EXPERT'S TESTIMONY**

**1.    September 16, 2002, Hearing**

Judith Findora, a vocational expert [VE], testified at the hearing.  (TR 290-95).  She described Plaintiff's past work:  customer service representative, sedentary and skilled; senior specification analyst, sedentary and skilled; laboratory technician, light and skilled; sample coordinator, medium and semi-skilled; and production supervisor, light and semi-skilled.  (TR 290-91).  The ALJ presented a hypothetical question to the VE in which a claimant with Plaintiff's age, education, and work experience was

> limited to lifting and carrying, pushing or pulling a maximum of 20 pounds occasionally and 10 pounds frequently.  Assume that the individual is limited to

---

[4]See Subpart E, infra, page 20.

16

> standing or walking in some combination for two out of eight hours, and can sit for
> six of eight hours, but should have the opportunity to change position at least every
> hour. All right. Assume that the individual can occasionally climb ramps or stairs.
> Can occasionally balance, stoop, kneel, crouch, crawl. The individual should not
> climb ladders, ropes or scaffolds. Should not be exposed to workplace hazards. The
> individual is noted to performing work that is simple and routine.

(TR 291-92). The VE testified that such a claimant would not be capable of Plaintiff's past work, primarily due to the limitation of simple and routine work. (TR 292). The VE testified that the following sedentary positions exist under these limitations: assembly positions, 12,600; general clerical, 11,100 positions; cashier, 16,800 positions; and accounting and auditing clerk, 12,400 positions. Id. The VE stated that sitting or standing at will would be provided for with the aforementioned positions, with the exception of the accounting and auditing clerk. (TR 293). However, the VE stated that the accounting and auditing clerk would be able to "stand and walk around and relieve any kinks and sit back down," thus, the job could be performed by a person who needs to change positions every hour. Id. The VE stated that her testimony was consistent with the Dictionary of Occupational Titles [DOT]. Id.

Plaintiff's representative asked the VE whether the aforementioned jobs would be precluded if the claimant could not complete tasks in a timely manner at a minimum of two thirds of the time. (TR 293-95). The VE stated that same would preclude the positions she listed and any other competitive employment. (TR 294, 295).

### 2.    April 13, 2004, Hearing

VE Ann Tremblay testified at the hearing. (TR 360-65). She described Plaintiff's past work: customer service representative, sedentary and semi-skilled; specification analyst, sedentary and skilled; and coordinator, medium and skilled. (TR 361). The ALJ presented a hypothetical question to the VE in which a claimant with Plaintiff's age, education, and work experience was

17

[l]imited to lifting, carrying, pushing or pulling no more than 10 pounds frequently and 20 pounds occasionally. Assume that this individual is limited to standing and walking a maximum of two of eight hours in an eight hour workday and that should be in increments of no more than fifteen minutes at any one time. The individual is able to sit for at least six of eight hours in an eight hour workday but should be able to alternate position for a few moments every hour. The individual cannot climb ladders, ropes, scaffolds. Cannot crawl. Can rarely bend. Can occasionally climb stairs. Occasionally balance, kneel, and crouch. The individual should not perform work that involves production quotas. Should not drive as a work duty. The individual should not be exposed to hazards. Assume that the individual is limited to performing simple and routine work that is low stress.

(TR 361-62). The VE clarified that "[l]ow stress would limit contact with the general public. There would be no production quotas. Generally one, two, three step." (TR 362). The VE testified that such a claimant would not be capable of Plaintiff's past work. Id. The VE testified that under these limitations, the following sedentary and unskilled jobs existed in the region: inspector, 2,200 positions; order clerk, 5,000 positions; and bench assembler, a reduced range of 8,000 positions. (TR 363). The VE further testified that additional limitations of lifting, carrying, pushing or pulling ten pounds occasionally and five pounds frequently did not affect the aforementioned positions. Id. The VE stated that "[t]he maximum unpredictable [absenteeism] would be about one per month." Id. The VE stated that her testimony was consistent with the Dictionary of Occupational Titles [DOT]. Id.

Plaintiff's counsel questioned the VE. (TR 364-65). She asked whether an inability to maintain attention and concentration in order to complete simple tasks in a timely manner would preclude work. (TR 364). The VE stated that same would preclude work. Id. Plaintiff's counsel asked whether a need to rest for twenty minutes every hour would interfere with being able to sustain work activity. (TR 365). The VE answered in the affirmative. Id.

18

### D.     ALJ'S CONCLUSIONS

#### 1.     November 20, 2002, Decision

After reviewing the testimony presented at the hearing and the medical evidence in the record, the ALJ found that "[o]bjective medical evidence demonstrates that fibromyalgia, chronic fatigue syndrome, depression, a pain disorder and an adjustment disorder impose significant limitations upon the claimant's ability to work."  (TR 50, 53).  Although she has impairments that are severe within the meaning of the Regulations, she does not have an impairment or combination of impairments set forth in Appendix 1, Subpart P, Regulations No. 4.  Id.  The ALJ found Plaintiff's testimony not to be credible.  (TR 50-51, 53).  She determined that Plaintiff had the RFC to perform the following jobs:  assembler, 12,600 positions; general clerical, 11,000 positions; and cashier, 16,800 positions.  (TR 52, 53).  Thus, the ALJ concluded that Plaintiff is not eligible for disability.  Id.

#### 2.     August 23, 2004, Decision

After reviewing the testimony presented at the hearing and the medical evidence in the record, the ALJ found that the "[o]bjective medical evidence demonstrates that fibromyalgia, chronic fatigue syndrome, depression, a pain disorder, and depressive and anxiety-related disorders impose significant limitations upon the claimant's ability to work." (TR 23, 27).   Although she has impairments that are severe within the meaning of the Regulations, she does not have an impairment or combination of impairments set forth in Appendix 1, Subpart P, Regulations No. 4.  Id.  The ALJ found Plaintiff's testimony not to be credible.  (TR 23-24, 27).  She determined that Plaintiff had the RFC to perform a limited range of sedentary work.  (TR 26, 28).  Thus, the ALJ concluded that Plaintiff is not eligible for disability.  Id.

19

E.      **ANALYSIS**

Plaintiff advances several claims in her Motion for Summary Judgment.  Plaintiff's Motion argues that the ALJ's decision is not supported by substantial record evidence because:  (1) the ALJ failed to find that Plaintiff's migraines were severe; (2) the ALJ further failed in assessing Plaintiff's fibromyalgia and chronic fatigue syndrome; (3) the ALJ erred in assessing Plaintiff's credibility; (4) the ALJ failed to give controlling weight to Plaintiff's providers; and (5) the ALJ failed to form a proper hypothetical.[5]  In response, Defendant's Motion for Summary Judgment contends that these aspects of the ALJ's decision are supported by substantial evidence.[6]  The matter is now ready for decision.

1.      **Standard of Review**

This Court's review of the ALJ's conclusions is limited.  The findings of the ALJ regarding Plaintiff's disabled status are conclusive if supported by substantial evidence based on the record as a whole.  42 U.S.C. § 405(g) (1997).  Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  It is more than a scintilla of evidence, but less than a preponderance of evidence.  <u>Brainard v. Secretary of Health and Human Servs.</u>, 889 F.2d 679, 681 (6th Cir. 1989).  This standard presupposes that there is a "zone of choice" within which the ALJ may make a decision without being reversed.  <u>Felisky v. Bowen</u>, 35 F.3d 1027, 1035 (6th Cir. 1994).  Even if the court might arrive at a different

---

[5]Plaintiff's Motion for Summary Judgment and Brief filed September 8, 2005 (hereinafter "Plaintiff's Brief"), at pages 2-17.

[6]Defendant's Motion for Summary Judgment and Brief filed November 9, 2005 (hereinafter "Defendant's Brief"), at pages 7-15.  Plaintiff's Reply to Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment was filed November 16, 2005 (hereinafter "Plaintiff's Reply"), responding to the arguments raised by Defendant.

20

conclusion, an administrative decision must be affirmed if it is supported by substantial evidence. Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986). Finally, consideration of the whole record does not mean that the ALJ must mention or comment on each piece of evidence submitted. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). Applying these standards, I will analyze each of Plaintiff's claims.

### a.    Migraine Headaches

Plaintiff argues that the ALJ failed to recognize Plaintiff's migraine headaches as a severe impairment.[7]  Plaintiff is correct in arguing that

> For an impairment to be considered as "not severe" it must be a "slight abnormality which has such a minimal effect on the individual that it would jot [sic] be expected to interfere with the individual's ability to work, irrespective of age, education ;and work experience." Farris v. Secretary of Health and Human Services, 773,F.2d 85, 90 (6th Cir. 1985) (quoting Brady v. Heckler, 724 F.2d 914, 919 (11th Cir. 1984). The court in Farris also determined that no substantial evidence in the record supported the ALJ's finding that the claimant's impairments did not affect her ability to work. Farris v. Secretary of Health and Human Services, 773,F.2d 85, 90 (6th Cir. 1985).[8]

Although Defendant mentions that Plaintiff complained of migraine headaches at the April 2004 hearing,[9] Defendant fails to respond to Plaintiff's argument regarding the ALJ's failure to find the headaches "severe."

As Plaintiff points out, the ALJ stated that Plaintiff "reported migraine headaches for which she took Midrin.  She indicated that her migraine headaches lasted as long as five days."[10]  (TR 20).

_____

[7]Plaintiff's Brief at pages 2-4.

[8]Plaintiff's Brief at page 3.

[9]Defendant's Brief at page 3.

[10]Plaintiff's Brief at page 3.

21

Further, the ALJ acknowledge that she reported headaches and noted that "Imitrex was prescribed October 30, 2003."  (TR 23).  However, the ALJ fails to find same to be a severe impairment.

In Miyoshi v. Bowen, 696 F.Supp. 346, 350 (7th Cir. 1988), the Seventh Circuit pointed out that

> [i]n [the] search for objective "medical signs or findings ... that there is a medical condition that could be reasonably expected to produce" claimant's headaches, see Sparks v. Bowen, 807 F.2d at 618, the ALJ required more of claimant than medical science itself can provide. Migraine headaches are vascular in nature and do not necessarily produce the type of laboratory evidence that the ALJ seemed to demand.

There was also testimony by Dr. Voelpel regarding the testimony and potential causes of the headaches at the hearing.[11]  (TR 352-53).  In addition, as Plaintiff partially points out,[12] her headache complaints are documented in the record as well as doctor's notes regarding same and prescriptions for Midrin and Imitrex.  (TR 110, 206, 216,[13] 224, 225, 227, 233-35, 238).  She also noted in her daily activities on August 11, 2001, that she woke up with a migraine headache.  (TR 120).

Thus, due to the amount of evidence, the undersigned does not find that the migraine headaches are only a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience."  Farris, 773 F.2d at 90.  Therefore, substantial evidence does not support the ALJ's failure to reference the severity or credibility related to Plaintiff's allegations of migraines, headaches, and the treatment of same.

---

[11]See supra, Section A, subsection 2, part c at page 16.

[12]Plaintiff's Brief at page 4.

[13]Duplicate of TR 206.

**b.      Fibromyalgia/ Chronic Fatigue Syndrome**

Plaintiff argues the ALJ failed to take into account SSR 99-2p in assessing Plaintiff's chronic fatigue and fibromyalgia.[14]  SSR 99-2p reads in pertinent part:

> CFS [chronic fatigue syndrome] is a systemic disorder consisting of a complex of symptoms that may vary in incidence, duration, and severity. The current case criteria for CFS, developed by an international group convened by the Centers for Disease Control and Prevention (CDC) as an identification tool and research definition, include a requirement for four or more of a specified list of symptoms. These constitute a patient's complaints as reported to a provider of treatment. However ... [d]isability may not be established on the basis of an individual's statement of symptoms alone.
>
> According to SSR 99-2p, the manifestations of fibromyalgia and CFS are:
>
> the presence of clinically evaluated, persistent or relapsing chronic fatigue that is of new or definite onset (i.e., has not been lifelong), cannot be explained by another physical or mental disorder, is not the result of ongoing exertion, is not substantially alleviated by rest, and results in substantial reduction in previous levels of occupational, educational, social, or personal activities.  Additionally, the current CDC definition of CFS requires the concurrence of 4 or more of the following symptoms, all of which must have persisted or recurred during 6 or more consecutive months of illness and must not have pre-dated the fatigue:
>
> Self-reported impairment in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social, or personal activities;
>
> Sore throat;
>
> Tender cervical or axillary lymph nodes;
>
> Muscle pain;
>
> Multi-joint pain without joint swelling or redness;
>
> Headaches of a new type, pattern, or severity;
>
> Unrefreshing sleep; and
>
> Postexertional malaise lasting more than 24 hours.
>
> Within these parameters, an individual with CFS can also exhibit a wide range of other manifestations, such as muscle weakness, swollen underarm (axillary) glands, sleep disturbances, visual difficulties (trouble focusing or severe photosensitivity), orthostatic intolerance (e.g., lightheadedness or increased fatigue with prolonged standing), other neurocognitive problems (e.g., difficulty comprehending and processing information), fainting, dizziness, and mental problems (e.g., depression, irritability, anxiety).

---

[14]Plaintiff's Brief, at pages 4-11.

The Ruling also addresses the requirement of Sections 223(d)(3) and 1613(a)(3)(D) of the Social Security Act and 20 C.F.R. §§ 404.1508, 416.908, that evidence of an impairment must include objective clinical or laboratory manifestations.

For purposes of Social Security disability evaluation, one or more of the following medical signs clinically documented over a period of at least 6 consecutive months establishes the existence of a medically determinable impairment for individuals with CFS:

Palpably swollen or tender lymph nodes on physical examination;

Nonexudative pharyngitis;

Persistent, reproducible muscle tenderness on repeated examinations, including the presence of positive tender points; or,

Any other medical signs that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record.

SSR 99-2p (footnote omitted).

The Ruling also recognizes that at the present time, there are no laboratory findings that are accepted as confirmatory of CFS.

Bartyzel v. Comm'r of Soc. Sec., 74 Fed.Appx. 515 (2003), 526-27 (6th Cir. 2003) (unpublished).

Neither party denies that Plaintiff has been diagnosed with fibromyalgia; and both parties also agree that mere diagnosis says nothing about the severity of the condition.[15]  Defendant's argue that the analysis depends on Plaintiff's subjective complaints of pain and fatigue; thus, it is more appropriately analyzed as a credibility determination.[16]  Plaintiff argues that Defendant fails to address SSR 99-2p and that rather than credibility, the Ruling suggests an analysis of the treating physician's findings.[17]  Both issues will be discussed below.

---

[15]Defendant's Brief at page 9; Plaintiff's Reply at page 2.

[16]Defendant's Brief at page 9.

[17]Plaintiff's Reply at page 2.

24

c.      **Credibility**

Plaintiff alleges that the ALJ improperly assessed her credibility.[18] In evaluating subjective complaints of disabling pain, this court looks to see whether there is objective medical evidence of an underlying medical condition, and if so then, 1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or, 2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  McCoy on Behalf of McCoy v. Chater,  81 F.3d 44, 47 (6th Cir. 1995) (quoting Stanley v. Sec'y of Health and Human Servs., 39 F.3d 115, 117 (6th Cir.1994) (citing Jones v. Sec'y of Health and Human Servs., 945 F.2d 1365, 1369 (6th Cir.1991) and (quoting Duncan v. Sec'y of Health and Human Servs., 801 F.2d 847, 853 (6th Cir.1986)).

In order to determine disability based on subjective complaints, we look to 20 CFR § 404.1529(c)(3) and the following factors:

> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 minutes to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

---

[18]Plaintiff's Brief at pages 8, 11-13.

As Social Security Ruling (SSR) 96-7p points out, the ALJ's "determination or decision must contain specific reasons for the finding on credibility . . . to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." See also, Murray v. Comm'r of Soc. Sec., 2004 WL 1765530, *4 (E.D. Mich., Aug. 3, 2004) (slip copy).

The ALJ specifically discussed Plaintiff's credibility. (TR 23-24). She stated that

descriptions of the claimant's activities of daily living are not consistent with Dr. Manlapit's report. During a consultative examination in May 2001, the claimant reported that she drove, did housework, maintained a checking account and credit card accounts, cooked occasionally, and did laundry (Exhibit 4F/4). She reported similar activities to another consultative examiner in June 2001 (Exhibit 9F). The claimant's report of her daily activities in Exhibit 8E reflects that she did household chores, shopped, used a computer, read on a regular basis, and drove locally. The claimant's husband confirms that the claimant's daily activities have included doing household work, shopping, maintaining finances, reading, attending sporting events, and going out to eat. (Exhibit 7E).

The claimant testified that she is able to perform most of her housework with pacing herself, that she shops and carries light packages, occasionally takes out the trash, uses a computer for short periods of time, drives (and can share the driving on longer trips). When her son was in high school, she was able to attend most of his baseball and football sporting events. On September 20, 1999, the claimant's husband reported that the claimant cooked breakfast for her son, cleaned the house when needed, provided transportation for her son, cooked dinner, read books, enjoyed watching sporting events, went boating occasionally with friends in the summer, visited her friends, walked the dog, and sang karaoke. She was described as personable and drove daily, did light yard work, shopped weekly with no difficulty, groomed herself daily, attended sporting events although she had some difficulty sitting for any length of time, visited with neighbors, went out to eat 2 or 3 times per week, and handled her finances.

(TR 23-24, 25). This analysis is hardly conclusory. However, although an ALJ is not required to discuss each and every piece of evidence, he or she "may not pick and choose the portions of a single report, relying on some and ignoring others, without offering some rationale for his decision." Young v. Comm'r of Soc. Sec., 351 F.Supp.2d 644, 649 (E.D.Mich. 2004).

The ALJ noted that Plaintiff's husband confirmed certain activities, but failed to mention that he stated that she only "[o]ccasionally does light housework but in too much pain to do anything else . . . [d]oesn't socialize often . . . [s]he doesn't get out in groups . . . [h]as trouble driving at night . . . [h]as trouble sitting or standing for any length of time . . . [g]ets tired easily . . . [p]ersonal care and grooming is good although some days she can't get dressed because she is too ill."  (TR 112-17).

The Sixth Circuit has recognized in <u>Walston v. Gardner</u>, 381 F.2d 580, 586 (6th Cir.1967), "[a] man is disabled within the meaning of the Act, if he can engage in substantial activity only by enduring great pain."  This may be such a case; however , it is not for the undersigned to determine credibility.   It is the duty of the undersigned to review all the evidence and determine whether the ALJ's decision was supported by substantial evidence.  The ALJ noted that Plaintiff's husband confirmed some of her daily activities, but neglected all portions of his report that supported her disability; thus, her decision should not be found to be supported by substantial evidence.

### d.    Treating Physicians

Plaintiff argues that the ALJ failed to accord substantial weight to Plaintiff's treating physicians' opinions regarding her disability.[19]  The medical opinions and diagnoses of treating physicians are entitled to substantial deference, particularly if those opinions are uncontradicted. <u>King v. Heckler</u>, 742 F.2d 968, 974 (6th Cir. 1984).   However, this is true only if the treating physician's opinion is based on sufficient medical data.  <u>See</u> 20 C.F.R. § 404.1529.  It is often misunderstood that the determination of disability is the prerogative of the Secretary, and not the treating physician.  <u>Kirk v. Sec. Of Health & Human Servs.</u>, 667 F.2d 524, 538 (6th Cir. 1981); <u>Duncan</u>, 801 F.2d at 855;  20 C.F.R. § 404.1527.   An ALJ may reject a physician's opinion when

---

[19]Plaintiff's Brief at pages 13-16.

it is brief, conclusory, or not supported by medically acceptable clinical or laboratory diagnosis techniques.  20 C.F.R. § 404.1527(d)(2).  Accordingly, treating physicians' opinions must be grounded on objective medical evidence, and no deference need be afforded those opinions if they are simply conclusory.  Houston v. Secretary of Health and Human Servs., 736 F.2d 365, 367 (6th Cir. 1984); Duncan, 801 F.2d at 855 (citing King, 742 F.2d at 973).   In other words, the weight to be given a doctor's opinion by an ALJ will depend on the extent to which it is supported by "specific and complete clinical findings."  Giddings v. Richardson, 480 F.2d 652, 656 (6th Cir. 1973).  See also, Cutlip v. Secretary of Health and Human Servs., 25 F.3d 284, 287 (6th Cir. 1994) (citing Young v. Secretary of Health & Human Servs., 925 F.2d 146, 151 (6th Cir.1990)).

The ALJ articulated his reasons for not according Plaintiff's treating physician's disability opinion deference.  In Wilson, the Sixth Circuit found that

> [i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion. Id.

Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004).  Further, under 20 C.F.R. § 404.1527(d)(2), (5), an "ALJ may give greater weight to well supported opinion of treating physician who specializes in treatment of the condition involved."

The ALJ gave the following reasons in assessing Plaintiff's treating physicians:

> [t]he claimant's treating physician, Dr. Manlapit, opined in October 2000 (Exhibit 3F) and in July 2002 (Exhibit 11F) that the claimant is unable to work and is disabled.  In October 2000, Dr. Manlapit indicated that the claimant was only able to work at about 30% of her normal capacity.  He stated that she had impairment of short term memory and concentration that caused substantial reduction in her previous levels of

28

occupational, educational, and social/personal activities. However, descriptions of the claimant's activities of daily living are not consistent with Dr. Manlapit's report. During a consultative examination in May 2001, the claimant reported that she drove, did housework, maintained a checking account and credit card accounts, cooked occasionally, and did laundry (Exhibit 4F/4). She reported similar activities to another consultative examiner in June 2001 (Exhibit 9F). The claimant's report of daily activities in Exhibit 8F reflects [sic] that she did household chores, shopped, used a computer, read on a regular basis, and drove locally. The claimant's husband confirms that the claimant's daily activities have included doing household work, shopping, maintaining finances, reading, attending sporting events, and going out to eat. (Exhibit 7E).

Dr. Rao filled out a questionnaire on March 26, 2001, but it is not accompanied by clinical progress notes or reports of treatment. Dr. Rao stated that the claimant did not respond to anti-depressants, but other sources document that the claimant has been fairly well maintained on Wellbutrin since it was prescribed in 1999. Following seven months for which there are no treatment records from any source, the claimant had a consultative psychological evaluation on May 5, 2001 by Dr. Olson. . . .

[t]he opinions of Drs. Plasencia, Rao, and Manlapit that the claimant is unable to work are not consistent with other, substantial evidence of record, including clinical examinations, the treatment history, the claimant's level of activities, and the medical expert testimony. Dr. Voelpel, a Board-certified internist, testified that the medical record shows no evidence of structural limitations. The doctor indicated that if an individual is unable to be active 3 or 4 days per weeks (that is, more than 50% of the time), clinical evidence of loss of muscle mass would be expected. However, on clinical examination, the claimant has normal muscle strength and tone. For example, Dr. Grover noted in September 2003 that the claimant's lower extremity strength was 5/5 (Exhibit 13F/32).[20] Dr. Fritzen, a psychologist, testified that the claimant has been assigned a global assessment of functioning of 49, but also one of 65. According to Dr. Fritzen, global assessment of functioning scores are somewhat subjective. Dr. Fritzen opined that the claimant's activities of daily living, social functioning, and functioning in the area of concentration, persistence and pace are moderately impaired. He found no evidence of episodes of decompensation.

(TR 23-25). However, as Plaintiff points out, the statement by Dr. Voelpel is taken out of context and is only "one simple sentence."[21] Dr. Voelpel also testified that the problem with fibromyalgia

---

[20](TR 248).

[21]Plaintiff's Reply at page 5.

29

is that "[t]here isn't a specific laboratory test that we can rely on that helps us consistently determine the activity of the disease." (TR 342).[22]

The ALJ's analysis of Dr. Manlapit and Dr. Rao's findings of disability is not inconsistent with <u>Wilson</u>. 378 F.3d at 544 (The ALJ is only required to give controlling weight to a treating physician if she finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." (quoting 20 C.F.R. § 404.1527(d)(2)).

However, the ALJ's analysis, or lack thereof of Dr. Plasencia, is not supported by substantial evidence. The ALJ summarizes Dr. Plasencia's findings, but does not properly evaluate it. (TR 22-23). The ALJ acknowledges Dr. Plasencia's finding of disability on April 24, 2004. (TR 23). Nonetheless, the ALJ rejects the finding in a conclusory fashion[23] contrary to <u>Wilson</u> and the Order of the Appeals Council. (TR 61-63). Meaningful appellate review is impossible if the ALJ does not clearly set forth her reasons for rejecting Dr. Plasencia's opinion.

### e.    Hypothetical and RFC

Plaintiff argues that the ALJ's hypothetical and RFC do not match.[24] Specifically, Plaintiff alleges that the ALJ did not include the following in either her RFC or hypothetical to the VE: pain, fatigue, concentration, persistence or pace, and stooping.[25]

---

[22]<u>See</u> <u>supra</u>, at pages 14-17.

[23]<u>See</u> <u>supra</u>, at page 29.

[24]Plaintiff's Brief at pages 16-17.

[25]Plaintiff's Brief at pages 16-17; Plaintiff's Reply at pages 6-7.

The ALJ does not have to include all medical conditions or restrictions. As in <u>Maziarz</u> <u>v.Secretary of Health & Human Servs.</u>, 837 F.2d 240, 247 (6th Cir. 1987),

> [t]he vocational expert merely responded to several hypothetical questions which presumed different physical restrictions allegedly placed on claimant. The vocational expert did not determine what restrictions claimant in fact had. Rather, it was the ALJ's function to first determine what medical restrictions claimant was under and how they affected his residual functional capacity, and then to determine whether the vocational expert had identified a significant number of jobs in a relevant market given these restrictions.

If the ALJ does not find that Plaintiff's unreliability is credible, he does not have to include it in his RFC or hypothetical. However, the ALJ's credibility determination of her pain and fatigue was flawed for the aforementioned reasons.

As to the ALJ's RFC hypothetical to the VE regarding concentration, persistence, or pace, the ALJ found that Plaintiff was only moderately limited in this regard, due to her ability "to handle her own finances, use a computer on occasion, drive, read, shop, and cook light meals." (TR 25). Further, contrary to Plaintiff's allegations,[26] the ALJ did find that she had severe impairments of depression and anxiety related disorders that imposed significant limits on her ability to work. (TR 23).

The ALJ reasonably limited Plaintiff to "work that [does not] involve[] production quotas. . . . [and] limited [her] to performing simple and routine work that is low stress." (TR 362). Again, it bears repeating that the VE clarified that "[l]ow stress would limit contact with the general public. There would be no production quotas. Generally one, two, three step." <u>Id.</u> In <u>Smith v. Halter</u>, 307

_____

[26]Plaintiff alleges that "the ALJ did not find the Plaintiff's psychiatric condition to be 'severe.'" Plaintiff's Reply at page 7.

31

F.3d 377 (6th Cir. 2001), the Sixth Circuit found that the ALJ's hypothetical was supported by substantial evidence where

> the ALJ relied on the testimony of four physicians who characterized Smith's concentration problems as minimal or negligible. The ALJ then translated Smith's condition into the only concrete restrictions available to him--examining psychiatrist Schweid's recommended restrictions against quotas, complexity, stress, etc.--and duly incorporated them into his hypothetical to the vocational expert.

Thus, the ALJ's treatment of Plaintiff's limitations regarding concentration, persistence, or pace is supported by substantial evidence.

As to stooping, the ALJ mentions it in his RFC, but not in his hypothetical to the VE.  (TR 26).  In Webb v. Comm'r of Soc. Sec., 368 F.3d 629, 633 (6th Cir. 2004), the Court explained how the RFC and hypothetical work together.

> [W]hile the [residual functional capacity] should focus on Howard's abilities or, in other words, what Howard can and cannot do, the hypothetical question should focus on Howard's overall state including Howard's mental and physical maladies. . . The vocational expert's testimony is directed solely to whether, given a claimant's age, experience, and education, along with the ALJ's assessment of what she "can and cannot do," there exist a significant number of employment opportunities for her in the regional and national economies.

Further,

> [i]n Foster v. Halter, 279 F.3d 348 (6th Cir. 2001), we stated that a hypothetical question need only reference all of a claimant's limitations, without reference to the claimant's medical conditions. Foster, 279 F.3d at 356. In Varley v. Sec'y of Health and Human Servs., 820 F.2d 777 (6th Cir. 1987), a case cited in Howard, we likewise determined that a vocational expert need only "take[ ] into account plaintiff's limitations." Varley, 820 F.2d at 780. . . .
>
> The vocational expert is not expected to evaluate the claimant's medical conditions in making this determination. Indeed, vocational experts are not required to have any medical training, so any evaluation of medical evidence they perform would be outside their area of expertise. Accordingly, in light of the facts present in Howard, this circuit's prior case law, and the role of a vocational expert under the social

security regulations, we do not read <u>Howard</u> to hold that hypothetical questions to vocational experts are required to include lists of claimants' medical conditions.

<u>Webb</u>, 368 F.3d at 633.  Specifically, the Court analyzed its previous decision in <u>Howard v. Comm'r of Soc. Sec.</u>, 276 F.3d 235 (6th Cir. 2002), recognizing that while

> [t]he hypothetical question posed to a [vocational expert] for purposes of determining whether Howard can perform other work, on the other hand, should be a more complete assessment of her physical and mental state and should include an "accurate [ ] potray[al] [of her] individual physical and mental impairment[s]." <u>Varley v. Sec'y of Health and Human Servs.</u>, 820 F.2d 777, 779 (6th Cir. 1987); <u>Myers v. Weinberger</u>, 514 F.2d 293, 294 (6th Cir.1975) (per curiam). Thus, while the [residual functional capacity] should focus on Howard's abilities or, in other words, what Howard can and cannot do, the hypothetical question should focus on Howard's overall state including Howard's mental and physical maladies. . .

<u>Id.</u>  SSR 83-14 provides in pertinent part:

> Two types of bending must be done frequently (from one-third to two-thirds of the time) in most medium, heavy, and very heavy jobs because of the positions of objects to be lifted, the amounts of weights to be moved, and the required repetitions.  They are stooping (bending the body downward and forward by bending the spine at the waist) and crouching (bending the body downward and forward by bending both the legs and spine).  However, to perform substantially all of the exertional requirements of most sedentary and light jobs, a person      would not need to crouch and would need to stoop only occasionally (from very little up to one-third of the time, depending on the particular job).

SSR 83-14, 1983 WL 31254, *2 (S.S.A. 1983).  SSR 96-9p provides as follows, in relevant part:

> An ability to stoop occasionally; i.e., from very little up to one third of the time, is required in most unskilled sedentary occupations. A <u>complete inability to stoop would significantly erode</u> the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply, <u>but restriction to occasional stooping should, by itself, only minimally erode</u> the unskilled occupational base of sedentary work. Consultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping.

<u>See</u> SSR 96-9p, 61 Fed. Reg. 34478, 34482 (1996)(emphasis added).

The ALJ mentioned crouching and stooping at the first hearing while questioning the VE, but failed to do so at the supplemental hearing. (TR 292). As the Ruling indicates there is a difference between the two. SSR 83-14. Thus, the ALJ should have included stooping in his hypothetical to the VE. It is recommended that the ALJ correct this inconsistency upon remand.

### 2. Remand Versus Benefits

The remaining issue is whether remand or an award of benefits is the appropriate remedy for Plaintiff.

It is firmly established that under § 405(g), a court may remand for an award of benefits "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." Faucher v. Sec. of Health & Human Servs., 17 F.3d 171, 174 (6th Cir. 1994)(citations omitted). More specifically, "[a] judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." Id. (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

Here, the ALJ's adverse decision was deprived of substantial evidentiary support because the ALJ did not find migraines to be a "severe" impairment, nor did she properly assess credibility pursuant to 20 CFR § 404.1529(c)(3). The credibility determination may also have an effect on the hypothetical challenges posed by Plaintiff. Further, the ALJ failed to properly explain her dismissal of Dr. Plasencia's opinion of disability. Therefore, there are factual issues to be resolved and further proceedings are necessary. Thus, a remand for an award of benefits at this time would be premature and inappropriate.

III.    **CONCLUSION**

For the reasons stated, I respectfully recommend that the court **GRANT** Plaintiff's Motion for Summary Judgment **IN PART**, **DENY** Defendant's Motion for Summary Judgment, and **REMAND** this case to the Defendant Commissioner for further proceedings consistent with this Report.

Pursuant to Fed.R.Civ.P. 72(b) and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of the recommendation they may serve and file specific, written objection within ten days after being served with a copy thereof.  The parties are further informed that failure to timely file objections may constitute a waiver of any further right of appeal to the United States Court of Appeals.  United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

In accordance with the provisions of Fed.R.Civ.P. 6(b), the court in its discretion, may enlarge the period of time in which to file objections to this report.

s/Wallace Capel, Jr.

**WALLACE CAPEL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

**Dated:**  May 2, 2006

35

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**


**CERTIFICATE OF SERVICE**


I hereby certify that on <u>May 2, 2006</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>James Brunson, and James Dolenga</u>,


and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): <u>the Social Security Administration</u>.


<u>s/James P. Peltier</u>
United States District Court
Flint, Michigan 48502
810-341-7850
E-mail:  pete_peltier@mied.uscourts.gov


36